



[redacted]

SunTrust

# ACCESS 3 EQUITY LINE ACCOUNT AGREEMENT AND DISCLOSURE STATEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $360,000.00 | 11-29-2006 | | *** | | [redacted] | | |

References in the shaded area are for our use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** ZAFER S AYDINEL
LINDA A AYDINEL
2570 OKLAHOMA ST
WEST MELBOURNE, FL 329046245

**Lender:** SunTrust Bank
CLSC - Orlando
7455 Chancellor Drive
Orlando, FL 32809

**CREDIT LIMIT: $360,000.00** **DATE OF AGREEMENT: November 29, 2006**

**Introduction.** This ACCESS 3 EQUITY LINE ACCOUNT AGREEMENT AND DISCLOSURE STATEMENT ("Agreement") governs your line of credit (the "Credit Line" or the "Credit Line Account") issued through SunTrust Bank. In this Agreement, the words "Borrower," "you," "your," and "Applicant" mean each and every person who signs this Agreement, including all Borrowers named above. The words "we," "us," "our," and "Lender" mean SunTrust Bank. **You agree to the following terms and conditions:**

**Promise to Pay.** You promise to pay SunTrust Bank (SunTrust Bank, its successors and assigns, in addition to the terms referenced above, may also be referred to as "Bank" herein), or order, the total of all credit advances ("Advances") and FINANCE CHARGES, together with all costs and expenses for which you are responsible under this Agreement and/or under the security instrument ("Security Deed") which secures your Credit Line. You will pay your Credit Line according to the payment terms set forth below. **If there is more than one Borrower, each is jointly and severally liable on this Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower. Each Borrower authorizes any other Borrower, on his or her signature alone, to suspend, cancel or terminate the Credit Line, to request and receive credit Advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.**

**Term.** The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue as follows: The Account establishes a line of credit upon which Borrower may request Advances for a period of (10) years ("the Draw Period"), each Advance to be repaid under one of the three options described herein ("Option 1 Advances", "Option 2 Advances", or "Option 3 Advances"). The Account shall be payable in full no later than twenty (20) years from the date of execution of this Agreement ("the Maturity"), the last ten (10) years before Maturity being the full and final repayment period for Option 1 Advances and Option 2 Advances ("Repayment Period"). The Bank in its sole discretion may extend the Draw Period. If the Draw Period is extended, Borrower shall be notified and the Repayment Period shall be shortened by the same period of time that the Draw Period is extended.

**Access.** During the Draw Period, the Account may be accessed by (i) use of a draft ("Access 3 Check") supplied by Bank; (ii) use of an Access 3 Equity Line credit card ("Access 3 Credit Card") issued by Bank; (iii) Bank may provide overdraft coverage; (iv) other means Bank may authorize from time to time; or (v) any other advancement of funds by Bank on Borrower's behalf. Access 3 Credit Cards will not be offered in all states. Each of the access methods described above will only be available if allowed by applicable law.

**Initial Advance.** "Initial Advance" means the amount of money you will obtain at closing toward the purchase of your home, if applicable, or the first disbursement you are requesting to be extended on your Credit Line following the expiration of any applicable rescission period. If an Initial Advance is allowed by us at origination/closing for the purchase of your home, the minimum Initial Advance for that purpose must be at least $5,000.00.

**Subsequent Advances.** During the Draw Period, Borrower may obtain an Advance on the Account from time to time up to the available Credit Limit. The available credit for Advances is the Credit Limit, minus the sum of all unpaid Advances (including Advances initiated, but not yet posted to the Account) and any other charges posted to the Account. There is no minimum amount for Option 1 or Option 2 Advances, however, if Borrower chooses to repay an Access 3 Check Advance under Option 3 defined below, the minimum Advance amount shall be $5,000.00. In addition, Borrower is limited to five (5) outstanding Option 3 Advances at any one time. No minimum Advance amount shall be required by Lender for purchases made with the Access 3 Credit Card. Borrower may make up to eight (8) Access 3 Credit Card transactions daily, five (5) of which may be ATM cash advances, with a maximum aggregate daily total of $1,200.00. If Borrower elects overdraft coverage as provided in this Agreement, such Advances shall be in $100.00 increments. If Borrower presents an Advance which would exceed or violate these limitations, Lender may refuse to honor the Advance or may in its discretion pay the Advance and require repayment of the Advance under one of the other repayment options.

Borrower will not access the Account when such Advance will exceed Borrower's available Credit Limit, result in a default under this Agreement, or would violate any applicable law. Bank may refuse to make any requested Advance, including but not limited to, returning unpaid any Access 3 Check on the Account or refusing authorization for an Access 3 Credit Card transaction if (i) the request does not conform to the requirements of this Agreement; or (ii) at the time of the request, the outstanding Account balance, as reflected by Bank's records, exceeds (or upon making the Advance would exceed) the Credit Limit; or (iii) the ability to make Advances has been suspended, canceled or terminated as provided for in this Agreement. However, Bank, at its option, may pay any such Advance, and Borrower will pay any amount over the Credit Limit in the manner Bank requests.

**Overdraft Coverage.** Bank is authorized to advance funds from the Access 3 Account to provide overdraft coverage for Account Number ________________ maintained by Borrower with Bank ("Bank Account"). Whenever Borrower writes checks or otherwise creates debits which overdraw the Bank Account, Bank will make an Advance from the Access 3 Account in $100.00 increments to the Bank Account. If the Credit Limit on the Access 3 Account is not sufficient to cover the entire overdraft, but is sufficient to cover any one or more items creating such overdraft, Bank will make an Advance from the Access 3 Account, up to the amount of the available Credit Limit, in order to pay such item(s). If Bank makes an Advance which exceeds the Credit Limit, Borrower will pay any amount over the Credit Limit in the manner Bank requests. In the event that the Bank Account is held jointly with other individuals ("Joint Account Holder"), overdrafts on the Bank Account created by the Joint Account Holder will be provided overdraft coverage as prescribed in this paragraph.

**Option 3 Initial Advance Promotional Rate.** Borrower and Lender do hereby agree that Borrower may obtain an Advance or Advances at the time of the closing of this Agreement, or to be disbursed immediately upon expiration of any applicable rescission period (the "Initial Advance"). If Borrower requests an Initial Advance under Option 3 of at least Five-Thousand ($5,000.00) Dollars, then in such event such Initial Advance under Option 3 shall be treated as follows (Subsequent Advances under Option 3 other than the Initial Advance, and Option 1 and Option 2 Advances shall not be subject to this provision and shall be subject to calculation of the **ANNUAL PERCENTAGE RATE** as otherwise outlined in the Agreement):

The **ANNUAL PERCENTAGE RATE** ("APR") for the Option 3 Repayment Term of such Initial Advance shall be a fixed rate calculated at the time of the Advance as follows: for an Option 3 Repayment Term of such Initial Advance of sixty (60) months or less, at an APR equal to the 3-year Interest Rate Swap Index +2.650%; and for an Option 3 Repayment Term of such Initial Advance of seventy-two (72) months and up to one hundred-twenty (120) months, at an APR equal to the 5-year Interest Rate Swap Index +2.900% (collectively, the "Promotional Rate"). The APR for each Option 3 Advance will be determined using the applicable Interest Rate Swap Index in effect on the day preceding the first day of the Billing Cycle in which each such Advance is taken. For an Option 3 Initial Advance with an Option 3 Repayment Term of sixty (60) months or less, the current **Daily Periodic Rate** is 0.02121% and the corresponding **ANNUAL PERCENTAGE RATE** is 7.74000%, which rates are based upon the 3-year Interest Rate Swap Index of 5.09000% which was in effect on 11-29-2006; and for an Option 3 Initial Advance with a Option 3 Repayment Term of seventy-two (72) months up to one hundred-twenty (120) months, the current **Daily Periodic Rate** is 0.02189% and the corresponding **ANNUAL PERCENTAGE RATE** is 7.99000%, which rates are based upon the 5-year Interest Rate Swap Index of 5.09000% which was in effect on 11-29-2006. Because these rates can change, the **Daily Periodic Rate** and the corresponding **ANNUAL PERCENTAGE RATE** applicable to such Initial Advance may therefore differ from the disclosure above. The **ANNUAL PERCENTAGE RATE** does not include costs other than interest.

Should Borrower fail to fully comply with the requirements as outlined above, then in such event Lender shall be entitled and authorized to increase the **ANNUAL PERCENTAGE RATE** as to the Initial Advance having been made under Option 3 to the APR and **Daily Periodic Rate(s)** as otherwise reflected and disclosed in the Agreement for other Advances under Option 3, which such increase may become effective as early as the first Billing Cycle after it is identified by Lender that you have not met the requirements contained herein.

**ANNUAL PERCENTATE RATES AND PAYMENT TERMS DURING THE DRAW PERIOD**

ACCESS 3 EQUITY LINE ACCOUNT AGREEMENT AND DISCLOSURE
STATEMENT
(Continued)                                                                                                   Page 2

The ANNUAL PERCENTAGE RATE on Option 1 and Option 2 Advances shall be calculated at a rate equal to *The Wall Street Journal* Prime Rate +0.000%. The maximum ANNUAL PERCENTAGE RATE for Option 1 and Option 2 Advances will not exceed 18% per annum. During the Draw Period, Options 1 and 2 Advances have a variable rate of interest and the ANNUAL PERCENTAGE RATE can change as a result.

At the time of an Access 3 Check Advance taken under Option 3 (an "Option 3 Advance"), Borrower will choose a repayment term for each such Advance (the "Option 3 Repayment Term" which is more fully described below). The ANNUAL PERCENTAGE RATE for each Option 3 Repayment Term shall be a fixed rate calculated at the time of the Advance as more fully described in the Section herein entitled "Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE". For Option 3 Advances with an Option 3 Repayment Term of sixty (60) months or less, the fixed ANNUAL PERCENTAGE RATE shall be calculated at the time of the Advance at a rate equal to the 3-year Interest Rate Swap Index +3.250%. For Option 3 Advances with an Option 3 Repayment Term of seventy-two (72) months or more, the fixed ANNUAL PERCENTAGE RATE shall be calculated at the time of the Advance at a rate equal to the 5-year Interest Rate Swap Index +3.250%. The current value of both indices is published weekly by the Federal Reserve Board in Statistical Release H. 15(519) and can also be found on the Internet on the Federal Reserve's web page at www.federalreserve.gov/releases/h15. The maximum ANNUAL PERCENTAGE RATE for Option 3 Advances will not exceed 18% per annum.

During the Draw Period, by the payment due date shown on the monthly statement ("the Periodic Statement"), Borrower agrees to pay monthly either (i) the total amount owing as shown on the Periodic Statement (the "New Balance") or (ii) any portion of the New Balance, so long as Borrower pays at least a "Minimum Payment" which is the sum of the minimum payments for each of the three (3) Options as specifically set forth below, plus any applicable insurance premiums, debt cancellation or suspension charges, late charges, and/or miscellaneous fees as set forth on the Periodic Statement. In addition, if the New Balance exceeds the Credit Limit, Borrower will pay the amount indicated on the Periodic Statement, to reduce the Account balance to within the Credit Limit. All payments must be made in United States dollars and must be drawn on a financial institution located in the United States.

Option 1 - Revolving Line of Credit

During the Draw Period, the minimum monthly payment due for funds advanced under this Option shall be 1.5% of the total balances for Option 1. All Advances made by Access 3 Credit Card or for overdraft protection will be governed by and repaid under Option 1.

Option 2 - Interest Only

During the Draw Period, the minimum monthly payment due for funds advanced under this Option shall be the accrued interest on the balances for Option 2. Minimum payments made on balances under this Option will not result in any reduction of the principal balance.

Option 3 - Fixed Rate/Fixed Term

At the time of an Advance under Option 3, Borrower will select a repayment term of twelve (12), twenty-four (24), thirty-six (36), forty-eight (48), sixty (60), seventy-two (72), eighty-four (84), ninety-six (96), one hundred-eight (108), or one hundred-twenty (120) months by noting same on the Option 3 Check at the time of the Advance (the "Option 3 Repayment Term"). If Borrower does not specify a repayment term on the Option 3 Check, or if Lender is unable to determine the repayment term selected, the Option 3 Repayment Term for each such Advance shall be one hundred-twenty (120) months. The ANNUAL PERCENTAGE RATE on Advances made under this Option shall be fixed at the time the Advance is posted to the Account, as more fully described herein in the Section entitled "Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE", for the full Option 3 Repayment Term. The minimum monthly payment amount shall be based upon the amount of the Advance, the ANNUAL PERCENTAGE RATE, and the Option 3 Repayment Term. Each Advance taken under this option shall be amortized over the Option 3 Repayment Term to establish the minimum monthly payment amount.

Processing Fee. When Borrower has chosen to repay an Advance under Option 3, a $15 fee shall be assessed to the Account for processing the Option 3 Advance.

ANNUAL PERCENTAGE RATES AND PAYMENT TERMS DURING THE REPAYMENT PERIOD

The ANNUAL PERCENTAGE RATE for the Repayment Period for Option 1 and Option 2 Advances shall be fixed on the last day of the Draw Period based on *The Wall Street Journal* Prime Rate in effect on that day, plus the margin disclosed above for Option 1 and Option 2 Advances. The term during the Repayment Period for the full repayment of the outstanding Options 1 and 2 balances will be ten (10) years. The monthly payment amount for repayment of Options 1 and 2 will be established using a straight ten (10) year amortization and will be based upon the balances, the fixed interest rate and the ten (10) year term. All amounts of Options 1 and 2 Advance balances not paid as of the end of the Draw Period will be paid according to the terms applicable to the Repayment Period.

The ANNUAL PERCENTAGE RATE, the remaining term and the minimum monthly payment for the repayment of Option 3 Advances shall remain as determined by the Option 3 Repayment Term.

The minimum total monthly payment will be the sum of your Options 1, 2 and 3 minimum monthly payments, together with any applicable insurance premiums, debt cancellation or suspension charges, late charges, and/or miscellaneous fees dues. All indebtedness under this Agreement, if not already paid pursuant to the payment provisions herein, will be due and payable at the end of the Repayment Period.

How Your Payments Are Applied. Unless otherwise agreed or required by applicable law, payments and other credits will be applied as applicable to credit insurance, debt cancellation or suspension charges, then to any late charges and loan fees, then to any unpaid interest, and then to the balance of unpaid principal.

Receipt of Payments. All payments must be made by a check, automatic account debit, electronic funds transfer, money order, or other instrument in U.S. dollars and must be received by us at the remittance address shown on your periodic billing statement. Payments received at that address prior to 8:00 a.m. Eastern Time on any business day will be credited to your Credit Line as of the date received. If we receive payments at other locations, such payments will be credited promptly to your Credit Line, but crediting may be delayed for up to five (5) days after receipt.

Credit Limit. This Agreement covers a revolving line of credit for the principal amount of Three Hundred Sixty Thousand & 00/100 Dollars ($360,000.00), which will be your "Credit Limit" under this Agreement. During the Draw Period we will honor your request for credit advances subject to the section below on Lender's Rights. You may borrow against the Credit Line, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit. We reserve the right to pay or return any requested Advance that exceeds your credit limit. Your Credit Limit will not be increased should you overdraw your Credit Line Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds your Credit Limit, even if we have not yet billed you.

Charges to your Credit Line. We may charge your Credit Line to pay other fees and costs that you are obligated to pay under this Agreement, the Security Deed or any other document related to your Credit Line. In addition, we may charge your Credit Line for funds required for continuing insurance coverage as described in the paragraph titled "Insurance" below or as described in the Security Deed for this transaction. We may also, at our option, charge your Credit Line to pay any costs or expenses to protect or perfect our security interest in your property. These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your property. If you do not pay your property taxes, we may charge your Credit Line and pay the delinquent taxes. Any amount so charged to your Credit Line will be a credit advance and will decrease the funds available, if any, under the Credit Line. However, we have no obligation to provide any of the credit advances referred to in this paragraph.

Credit Advances. After the Effective Disbursement Date of this Agreement, you may obtain credit advances under your Credit Line as follows:

   Credit Line Checks. Writing a preprinted "Access 3 Equity Line Check" that we will supply to you.

   Requests in Person. Requesting a credit advance in person at any of our authorized locations.

If there is more than one person authorized to use this Credit Line Account, you agree not to give us conflicting instructions, such as one Borrower telling us not to give advances to the other.

Limitations on the Use of Checks. We reserve the right not to honor Access 3 Equity Line Checks in the following circumstances:

   Credit Limit Violation. Your Credit Limit has been or would be exceeded by paying the Access 3 Equity Line Check.

   Post-dated Checks. Your Access 3 Equity Line Check is post-dated. If a post-dated Access 3 Equity Line Check is paid and as a result any other check is returned or not paid, we are not responsible.

   Stolen Checks. Your Access 3 Equity Line Checks have been reported lost or stolen.

   Unauthorized Signatures. Your Access 3 Equity Line Check is not signed by an "Authorized Signer" as defined below.

   Termination or Suspension. Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Access 3 Equity Line Check.

   Transaction Violation. Your Access 3 Equity Line Check is less than the minimum amount required by this Agreement or you are in

## ACCESS 3 EQUITY LINE ACCOUNT AGREEMENT AND DISCLOSURE STATEMENT
(Continued)                                                                                                                 Page 3

violation of any other transaction requirement or would be if we paid the Access 3 Equity Line Check.

If we pay any Access 3 Equity Line Check under these conditions, you must repay us, subject to applicable laws, for the amount of the Access 3 Equity Line Check. The Access 3 Equity Line Check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return Access 3 Equity Line Checks along with your periodic billing statements; however, your use of each Access 3 Equity Line Check will be reflected on your periodic statement as a credit advance. We do not "certify" Access 3 Equity Line Checks drawn on your Credit Line.

**Transaction Requirements.** The following transaction limitations will apply to the use of your Credit Line:

   **Credit Line Access 3 Equity Line Check and In Person Request Limitations.** The following transaction limitations will apply to your Credit Line and the writing of Access 3 Equity Line Checks and requesting an advance in person.

**Authorized Signers.** The words "Authorized Signer" on Access 3 Equity Line Checks as used in this Agreement mean and include each person who (a) signs the application for this Credit Line, (b) signs this Agreement, or (c) has executed a separate signature authorization card for the Credit Line Account.

**Lost Access 3 Equity Line Checks.** If you lose your Access 3 Equity Line Checks or if someone is using them without your permission, you agree to let us know immediately. The fastest way to notify us is by calling us at (888) 461-8862. You also can notify us at Loan Servicing PO Box 85160, Richmond, VA 23286-9079.

**Future Credit Line Services.** Your application for this Credit Line also serves as a request to receive any new services (such as access devices) which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

**Collateral.** You acknowledge this Agreement is secured by the following collateral described in the security instrument listed herein: a Mortgage or Deed of Trust to a trustee in favor of us on real property located in BREVARD County, State of Florida. The collateral must be your primary or secondary residence.

**Insurance.** You must obtain insurance on the Property securing this Agreement that is reasonably satisfactory to us. You may obtain property insurance, and flood insurance if applicable, through any company of your choice that is reasonably satisfactory to us. You have the option of providing any insurance required under this Agreement through an existing policy or a policy independently obtained and paid for by you, subject to our right, for reasonable cause before credit is extended, to decline any insurance provided by you. Subject to applicable law, if you fail to obtain or maintain insurance as required in the Security Deed, we may purchase insurance to protect our own interest, but are not required to do so, add the premium to your balance, pursue any other remedies available to us, or do any one or more of these things. The insurance we purchase may be much more expensive and will, in most cases, provide less coverage than insurance you could buy.

**Right of Setoff.** To the extent permitted by applicable law, we reserve a right of setoff in all your accounts with us (whether checking, savings, or some other account), including without limitation, all accounts you may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. You authorize us, to the extent permitted by applicable law, to charge or setoff all sums owing on this Agreement against any and all such accounts.

**Periodic Statements.** If you have a credit or debit balance of more than $1.00, or if we have imposed a finance charge on your Credit Line Account, we will send you a Periodic Statement. Bank will safekeep the paid Access 3 Checks. Bank will make photocopies of Access 3 Checks and other instruments upon request. (If such request is not made in connection with a billing error inquiry, it may be subject to Research and Photocopy charges as described on below.)

Each Access 3 Check will be deemed to be an item for purposes of the Uniform Commercial Code ("UCC") of the state in which Bank is located and the time periods and other requirements for examining Periodic Statements and reporting improper entries will begin from the time Periodic Statements are sent or made available to Borrower. Bank assumes no responsibility for entries included on Periodic Statements not received unless Borrower gives notice within sixty (60) days of the date on which the Periodic Statement is customarily mailed that it was not received.

The rules for stopping payment on Access 3 Checks shall be the same as the Bank's rules for stopping payment on checks written on deposit accounts.

The Periodic Statement will show, among other things, credit advances, **FINANCE CHARGES**, other charges, payments made, other credits, your "Previous Balance," and your "New Balance". The Finance Charge ("Finance Charge") shall be the sum of the ATM Transaction Fee described herein and the Periodic Finance Charge ("Periodic Finance Charge"). A Periodic Finance Charge will be imposed on the Account and will be shown on the next Periodic Statement even if the New Balance was paid in full on or before the payment due date of the prior Periodic Statement. Your Periodic Statement also will identify the Minimum Payment you must make for that billing period and the date it is due.

**When FINANCE CHARGES Begin to Accrue.** Periodic FINANCE CHARGES for credit advances under your Credit Line will begin to accrue on the date credit advances are posted to your Credit Line. There is no "free ride period" which would allow you to avoid a FINANCE CHARGE on your Credit Line credit advances.

**Method Used to Determine the Balance on Which the FINANCE CHARGE Will Be Computed.** A daily FINANCE CHARGE will be imposed on all credit advances made under your Credit Line imposed from the date of each credit advance based on on the Average Daily Balance. For each Billing Cycle, the Periodic Finance Charge begins to accrue on Access 3 Check Advances on the day the Check is received by the Bank for payment and transaction. Bank calculates the Periodic Finance Charge on Options 1 and 2 by applying the Daily Periodic Rate to the average daily balance. To determine the "Daily Balance," take the beginning balance of each of the three (3) Options each day starting with the New Balance from the last Periodic Statement, plus all purchases, cash advances, Access 3 Checks, or any other Advances under each Option posted through that day, minus any unpaid Finance Charge, other charges, payments or other credits posted through that day. The "Average Daily Balance" is the sum of: the Daily Balance for each Option for the Billing Cycle divided by the actual number of days in the Billing Cycle. The Periodic Finance Charge for each Option 3 Advance will be calculated by multiplying each Option 3 Average Daily Balance by the Daily Periodic Rate, multiplied by the number of days in the Billing Cycle. The Periodic Finance Charge for the Account is the sum of the Periodic Finance Charges for the three (3) Options.

You also agree to pay FINANCE CHARGES, not calculated by applying a Periodic Rate, as set forth below:

**ATM Transaction Fee.** You will be charged an Automated Teller Machine ("ATM") transaction fee of $5.00 when you obtain a credit advance at any of our designated ATM locations.

**Option 3 Processing Fee.** When Borrower has chosen to repay an Advance under Option 3, a $15 fee shall be assessed to the Account for processing the Option 3 Advance.

**Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE.** We will determine the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE as follows. For Options 1 and 2 Advances, we start with an independent index which is the Prime Rate. The Daily Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE for Options 1 and 2, for each Billing Cycle will depend upon the Prime Rate. The "Prime Rate" means the per annum rate of interest published from time to time by *The Wall Street Journal* in its "Money Rates" listings, as the Prime Rate on the day preceding the first day of the Billing Cycle. In the event that on any particular day *The Wall Street Journal* publishes more than one Prime Rate, for purposes of this Agreement, the Prime Rate shall mean the highest Prime Rate so published. The ANNUAL PERCENTAGE RATE for each Option 3 Advance shall be determined according to the applicable Weekly Interest Rate Swap Index in effect on the day preceding the first day of the Billing Cycle in which each such Advance is taken. The Daily Periodic Rate for Option 3 for each Billing Cycle will depend upon the Option 3 Repayment Term. If the Option 3 Repayment Term is sixty (60) months or less, the rate is determined at the time of the draw using the 3-year Interest Rate Swap Index +3.250%. In the event of an Option 3 Repayment Term of seventy-two (72) months or more the rate is determined at the time of the draw using the 5-year Interest Rate Swap Index +3.250%. The current values of both indices are published weekly by the Federal Reserve Board in Statistical Release H. 15(519) and on the Federal Reserve's web page at www.federalreserve.gov/releases/h15. The number of days in the Billing Cycle and the statement closing date will be shown on each Periodic Statement. For example, if the statement closing date is September 1st and there are thirty (30) days in the Billing Cycle, to calculate the first day in the Billing Cycle, subtract thirty (30) days from September 1st, to arrive at August 2nd. This Billing Cycle would begin August 2nd and end September 1st. So if the first day of the Billing Cycle is August 2nd, the corresponding ANNUAL PERCENTAGE RATE for that Billing Cycle will equal the Prime Rate in effect on August 1st, plus or minus the margin. The Daily Periodic Rate equals the Prime Rate plus or minus the margin divided by actual number of days in the year. For Options 1 and 2 Advances, the Daily Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE may increase or decrease according to increases or decreases in the Prime Rate. If the Daily Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE increase, the Periodic Finance Charge and Minimum Payment may increase during the Draw Period. The increases and decreases caused by changes in the Prime Rate will take effect on the first day of each succeeding Billing Cycle and will remain in effect for the entire Billing Cycle. For Options 1 and 2, the current Daily Periodic Rate is 0.02260% and the corresponding ANNUAL PERCENTAGE RATE is 8.25000%. These rates are based upon the Prime Rate of 8.25000% which was in effect as of 11-29-2006.

## ACCESS 3 EQUITY LINE ACCOUNT AGREEMENT AND DISCLOSURE STATEMENT
(Continued)                                                                                                                                         Page 4

For Option 3 Advances with an Option 3 Repayment Term of sixty (60) months or less, the current Daily Periodic Rate is 0.02285% and the corresponding ANNUAL PERCENTAGE RATE is 8.34000%. These rates are based upon the 3-year Interest Rate Swap Index of 5.09000% which was in effect as of 11-29-2006. For Option 3 Advances with an Option 3 Repayment Term of seventy-two (72) months or more, the current Daily Periodic Rate is 0.02285% and the corresponding ANNUAL PERCENTAGE RATE is 8.34000%. These rates are based upon the 5-year Interest Rate Swap Index of 5.09000% which was in effect as of 11-29-2006. Because these rates can change, the Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE applicable to the first and subsequent Billing Cycles of the Account may differ from the disclosure above. The Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE will not change during the course of any one Billing Cycle. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period. No matter what else may be stated in any other provision of this Agreement or in any other document you may have with us, you do not agree or intend to pay, and we do not agree or intend to charge any interest or fee for the ACCESS 3 EQUITY LINE ACCOUNT AGREEMENT AND DISCLOSURE STATEMENT which would in any way cause us to contract for, charge or collect more for the Credit Line Account than the maximum we would be permitted to charge or collect by any applicable federal or Florida state law. Any such excess interest or unauthorized fee will be applied first to reduce the unpaid principal balance of the Credit Line Account, and when the principal has been paid in full, be refunded to you.

**Negative Amortization.** Under some circumstances, your payments will not cover the finance charges that accrue and negative amortization will occur. Negative amortization will increase the amount that you owe us and reduce your equity in your home.

**Conditions Under Which Other Charges May Be Imposed.** You agree to pay all the other fees and charges related to your Credit Line as set forth below:

    **Fee to Stop Payment.** Your Credit Line Account may be charged $30.00 when you request a stop payment on your account.

    **Overlimit Charge.** Your Credit Line Account may be charged $25.00 if you cause your Credit Line Account to go over your Credit Limit. This includes writing a Access 3 Equity Line Check in excess of your available balance.

    **Miscellaneous Photocopying.** If you request a copy of any document, we may charge your Credit Line Account $5.00 per check copy, $5.00 per statement copy and $25.00 per hour of extensive research time for the time it takes us to locate, copy, and mail the document to you. If your request is related to a billing error (see "Your Billing Rights" notice) and an error is found, we will reverse any photocopying charges.

    **Late Charge.** Your payment will be late if it is not received by us within 7 days after the "Payment Due Date" shown on your periodic statement. If your payment is late we may charge you 5.000% of the payment.

    **Other Charges.** Your Credit Line Account may be charged the following other charges: Returned Items. The amount of this other charge is: The greater of $25 or 5% of face amount of the instrument.

    **Settlement Charges/Closing Costs.** You agree to pay to us the additional FINANCE CHARGES and settlement charges ("Closing Costs") set forth below in connection with this account:

|                        |          |
|------------------------|----------|
| **Recording Fees       | $35.50   |
| **APPRAISAL /ILS       | $240.00  |
| **TITLE SCH /ILS       | $60.00   |
| **FLD DETERM /EFL      | $3.10    |
| **STATE TAX\STAMPS     | $647.50  |
| **CTY\CO TAX\STAMPS    | $370.00  |

We may agree to advance some or all of the Closing Costs on your behalf at, before or after the time of settlement; however, you agree that you shall reimburse us for the Closing Costs advanced by us on your behalf. We may add this amount to your account/loan balance at the time of payoff, or if requested you will pay us directly upon demand. A double asterisk (**) before the fee description and amount represents a Closing Cost advanced by us on your behalf, and subject to reimbursement as described herein, which you agree shall be solely a reimbursement and not a penalty. Accordingly, you agree to reimburse us in the amount of $1,356.10. This requirement to reimburse us for any Closing Costs advanced by us on your behalf shall be waived if you keep this account open for at least three (3) years from the date of the execution of this Agreement. In addition, if allowed by applicable law, you agree to pay the costs of recording the release or satisfaction of the Security Instrument, which shall or may be added to the payoff amount.

**Lender's Rights.** Under this Agreement, we have the following rights:

    **Termination and Acceleration.** We can terminate your Credit Line Account and require you to pay us the entire outstanding balance in one payment, and charge you certain fees, if any of the following happen: (1) You commit fraud or make a material misrepresentation at any time in connection with this Credit Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition. (2) You do not meet the repayment terms of this Credit Agreement. (3) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of any person liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien, the use of funds or the dwelling for prohibited purposes, or if title to the property is taken through eminent domain. These are each considered events of default.

    **Default Remedies.** Upon default, we may exercise any and all rights contained in this Agreement, the Security Instrument or any other rights provided to us by law or equity, including but not limited to, the right to sell the Real Property at a public auction or as provided by law. We may waive or decline to enforce any of our rights under this Agreement at any time without affecting any of our other rights under this Agreement. Furthermore, upon default, your authorization to initiate Advances on the Account shall terminate and we may return any Access 3 Checks unpaid or decline Access 3 Credit Card charges or cash advances, without liability to you and without prior notification.

    **Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect:

    (1) The value of your property declines significantly below the property's appraised value for purposes of this Credit Line Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances.

    (2) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a material change in your financial circumstances.

    (3) You are in default under any material obligations of this Credit Line Account. We consider all of your obligations to be material. Categories of material obligations include the events described above under Termination and Acceleration, obligations to pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligations to pay and perform the terms of any other deed of trust, mortgage or lease of the property, obligations to notify us and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of any comaker. No default will occur until we mail or deliver a notice of default to you, so you can restore your right to credit advances.

    (4) We are precluded by government action from imposing the ANNUAL PERCENTAGE RATE provided for under this Agreement.

    (5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120%) of the Credit Limit.

    (6) We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

    (7) We may prohibit additional extensions of credit or reduce your Credit Limit during any period in which the maximum ANNUAL PERCENTAGE RATE under your Credit Line Account is reached.

If we temporarily prohibit additional advances on the account and/or reduce the Credit Limit based upon any of the foregoing situations, we will provide you with written notice of said action after action is taken. The notice will explain how you can request reinstatement of credit privileges, if applicable.

## ACCESS 3 EQUITY LINE ACCOUNT AGREEMENT AND DISCLOSURE STATEMENT
(Continued)

Page 5

**Change in Terms.** We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant (such as changes relating to our data processing systems). If the Index is no longer available, we will choose a new Index and margin. The new Index will have an historical movement substantially similar to the original Index, and the new Index and margin will result in an ANNUAL PERCENTAGE RATE that is substantially similar to the rate in effect at the time the original index becomes unavailable.

**Collection Costs.** We may hire or pay someone else to help collect this Agreement if you do not pay. You will pay us that amount. This includes, subject to any limits under applicable law, our costs of collection, including court costs and fifteen percent (15%) of the principal plus accrued interest as attorneys' fees or reasonable attorneys' fees as allowed by law, if any sums owing under this Agreement are collected by or through an attorney at law, whether or not there is a lawsuit, and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, you also will pay any court costs, in addition to all other sums provided by law.

**Access Devices.** If your Credit Line is suspended or terminated, you must immediately return to us all Access 3 Equity Line Checks and any other access devices. Any use of Access 3 Equity Line Checks or other access devices following suspension or termination may be considered fraudulent. You will also remain liable for any further use of Access 3 Equity Line Checks or other Credit Line access devices not returned to us.

**Delay in Enforcement.** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. If we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. For example, not terminating your account for non-payment will not be a waiver of our right to terminate your account in the future if you have not paid.

**Cancellation, Termination or Suspension by You.** If you cancel your right to credit advances under this Agreement, you must notify us in writing at the address shown on your periodic billing statement or other designated address. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due under this Agreement (except for our obligation to make advances).

Your Account will automatically terminate on the earlier of Maturity or on the date we give you notice of the termination as the result of an occurrence of a default (as described herein). Upon termination of the Account, the entire Account balance then outstanding, with accrued interest and any fees and charges owing on the Account, will be due and payable in full on that date. Further you can terminate or suspend this Agreement by written notice, signed by you, and a request for a discharge of the Security Instrument, also signed by you, mailed or delivered to us at any time. In such event, your notice of termination will be effective on the first business day after we receive your written request to terminate or suspend, and provided that no further information or action is required to so terminate or suspend; and further in such event of termination the entire principal balance outstanding on your Account, plus interest accrued thereon, together with fees and charges owing on the Account, will be due and payable in full on that date, at our sole option. We shall terminate your Account or suspend Advance privileges upon our receipt of your written instructions of all Borrowers as described above; additionally, you agree and hereby authorize us that we may, but are not required to, terminate or suspend Advance privileges on your Account upon written request of any one of you. We may require a notarized writing before terminating the Account. In the event any Borrower terminates, suspends or cancels the Account, whether completely or only as to future Advances, you agree that you shall be jointly and severally liable to us as governed by the other provisions of this Agreement in the event any Borrower obtains an Advance before or after any suspension, cancellation or termination by any party.

We may at our option allow you to continue to make regular monthly payments or to restructure the amount owed in a mutually agreeable manner, or may require you to pay the entire unpaid balance in full.

**Prepayment.** You may prepay all or any amount owing under this Credit Line at any time without penalty, except we will be entitled to receive all accrued FINANCE CHARGES, and other charges, if any. Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments. Instead, they will reduce the principal balance owed on the Credit Line. You agree not to send us payments marked "paid in full", "without recourse", or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: SunTrust Bank, P.O. Box 27161 Richmond, VA 23261-7161.

**Notices.** All notices will be sent to your address as shown in this Agreement. Notices will be mailed to you at a different address if you give us written notice of a different address. You agree to advise us promptly of any change in your mailing address, any change in financial condition, or of any unauthorized use of the Account. As a material obligation under this Agreement, you will update the information and furnish us with additional financial aid or other information as we may request. You will immediately telephone us and confirm by letter if any Access 3 Checks or the Access 3 Credit Card are lost or stolen, and upon failure to do so, you will assume full responsibility if we should, without negligence, pay such Access 3 Checks. At the time of this Agreement, the telephone number for reporting lost or stolen checks is (888) 461-8862. Your liability for the unauthorized use of the Access 3 Credit Card shall not exceed the lesser of $50.00 or the amount of money, property, labor or services obtained by the unauthorized use of the Access 3 Credit Card prior to the time you notify us of the loss or theft of the card. We shall not be responsible to you in any manner if anyone refuses to accept an Access 3 Check as a manner of payment.

**Annual Review.** You agree that you will provide us with a current financial statement, a new credit application, or both, annually, on forms provided by us. Based upon this information we will conduct an annual review of your Credit Line Account. You also agree we may obtain credit reports on you at any time, at our sole option and expense, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition. We may require a new appraisal of the Property which secures your Credit Line at any time, including an internal inspection, at our sole option and expense. You authorize us to release information about you to third parties as described in our privacy policy and our Fair Credit Reporting Act notice, provided you did not opt out of the applicable policy, or as permitted by law.

**Transfer or Assignment.** Without prior notice or approval from you, we reserve the right to sell or transfer your Credit Line Account and our rights and obligations under this Agreement to another lender, entity, or person, and to assign our rights under the mortgage or deed of trust. Your rights under this Agreement belong to you only and may not be transferred or assigned. Your obligations, however, are binding on your heirs and legal representatives. Upon any such sale or transfer, we will have no further obligation to provide you with credit advances or to perform any other obligation under this Agreement.

**Tax Consequences.** You understand that neither we, nor any of our employees or agents, make any representation or warranty whatsoever concerning the tax consequences of your establishing and using your Credit Line, including the deductibility of interest, and that neither we nor our employees or agents will be liable in the event interest on your Credit Line is not deductible. You should consult your own tax advisor for guidance on this subject.

**Jury Waiver.** We and you hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either us or you against the other.

**INFORMATION REPORTED TO CREDIT BUREAUS.** UNDER THE FAIR CREDIT REPORTING ACT, YOU HAVE THE RIGHT TO NOTIFY US IF YOU BELIEVE WE HAVE REPORTED INACCURATE INFORMATION ABOUT YOUR ACCOUNT TO A CREDIT BUREAU OR CONSUMER REPORTING AGENCY. SUCH NOTICES SHOULD BE SENT IN WRITING AND INCLUDE YOUR COMPLETE NAME, CURRENT ADDRESS, SOCIAL SECURITY NUMBER, TELEPHONE NUMBER, ACCOUNT NUMBER, TYPE OF ACCOUNT, SPECIFIC ITEM OF DISPUTE AND THE REASON WHY YOU BELIEVE THE INFORMATION REPORTED IS IN ERROR. SEND YOUR NOTICE TO: SUNTRUST BANK, P.O. BOX 85052, RICHMOND, VA 23285-5052.

**Arbitration Clause. READ THIS PROVISION CAREFULLY; IT WILL HAVE A SUBSTANTIAL IMPACT ON HOW LEGAL CLAIMS WE HAVE AGAINST EACH OTHER ARE RESOLVED.** For a Claim subject to arbitration, neither you nor we will have the right to: (1) have a court or a jury decide the Claim; (2) engage in information-gathering (discovery) to the same extent as in court; (3) participate in a class action in court or in arbitration; or (4) join or consolidate your Claim(s) with claims of any other person. The right to appeal is more limited in arbitration than in court and other rights in court may be unavailable or limited in arbitration.

1. **DEFINITIONS.** As used in this Provision:
   "You" and "your" means the persons obligated to repay the Credit.
   "We", "us" and "our" means: (1) SunTrust Bank; (2) any person(s) to whom the Credit is transferred or assigned; (3) any Covered Provider; (4) the parents, subsidiaries and affiliates of the companies in (1)-(3) above; (5) the successors and predecessors of the companies in (1)-(4) above; and (6) the officers, directors and employees of the companies in (1)-(5) above.
   "Covered Provider" means any third party that provides any product or service in connection with the Credit if (and only if) such third party is named as a co-party with us in a Claim asserted by you.
   "Credit" means the loan or other credit extension you are receiving under this agreement or note and any prior loan or credit extension you have received from us.
   "Claim" means any claim, dispute or controversy between you and us, other than any Excluded Claim or Proceeding, arising from or relating in any way to the Credit. The term "Claim" is to be given the broadest possible meaning and includes claims of every kind and nature. "Claims"

ACCESS 3 EQUITY LINE ACCOUNT AGREEMENT AND DISCLOSURE
STATEMENT
(Continued)                                                                                                          Page 6

can seek relief of any type. A party does not waive the right to require arbitration of a new Claim by bringing a Claim in a lawsuit or failing to require arbitration of another Claim. Notwithstanding the broad definition of "Claim" set forth above, a "Claim" shall not include any self-help or non-judicial remedy, including but not limited to acceleration of the Credit, non-judicial foreclosure, self-help repossession and/or set-off; and shall not include any individual judicial action by a party that is limited to preventing the other party from using a self-help or non-judicial remedy and that does not involve a request for damages or monetary relief of any kind.

"Excluded Claim or Proceeding" means any of the following claims or proceedings, which will not be subject to this Arbitration Provision: (1) any individual action brought by you in small claims court or your state's equivalent court, unless such action is transferred, removed, or appealed to a different court; (2) any action to effect a judicial or quasi-judicial foreclosure; (3) any eviction or other summary proceeding to secure possession of real property securing a Credit; (4) any action to assert, collect, protect, realize upon or obtain possession of the collateral for a Credit in any bankruptcy proceeding; (5) any action to quiet title; (6) any action to the extent that it seeks provisional or ancillary remedies in connection with any of the foregoing; and (7) any individual action to prohibit any of the foregoing so long as it does not involve a request for damages or monetary relief of any kind.

"Administrator" means the National Arbitration Forum, P.O. Box 50191, Minneapolis, MN 55405, www.arb-forum.com, (800) 474-2371; or the American Arbitration Association, 335 Madison Avenue, New York, NY 10017, www.adr.org, as selected in accordance with this Provision. However, if both the NAF and AAA are unable to serve, the parties may agree upon another Administrator or, if they are unable to agree, a court shall determine the Administrator. No company may serve as Administrator, without the consent of all parties, if it adopts or has in place any formal or informal policy that is inconsistent with and purports to override the terms of this Provision.

"Notice Address" means the address that must be used for giving all notices under this Provision (other than notices given in lawsuits, which may be given in accordance with the rules of the court). The initial Notice Address for you is the latest address we have in our files. The initial Notice Address for us is: SUNTRUST BANK, 3600 SunTrust Plaza, 303 Peachtree Street, N.E., Atlanta, Georgia 30308, attn: Ray Fortin, General Counsel, although we may give you notice at any time that we have changed our Notice Address.

2. **STARTING AN ARBITRATION.** To start an arbitration, you or we must give written notice of an election to arbitrate, which notice may be given after a lawsuit has been filed and/or in papers filed in the lawsuit. If such a notice is given, the Claim(s) described in the notice shall be resolved by arbitration under this Provision and, to the extent consistent with this Provision, the applicable rules of the Administrator then in effect. If you elect to arbitrate a Claim, you can choose the Administrator in your notice. If we elect to arbitrate a Claim, you can choose the Administrator by giving us written notice of your selection within 20 days after the date of our notice; and we shall choose the Administrator if you do not timely do so. The arbitrator will be selected under the Administrator's rules, except that the arbitrator must be an attorney with at least ten years of experience or a retired judge unless the parties agree otherwise. Any party who wrongfully fails to comply with this Provision shall be liable to the other party for all reasonable costs, including attorneys' fees, incurred in enforcing this Provision.

3. **LOCATION AND COSTS.** Any arbitration hearing that you attend will take place in a location that is reasonably convenient for you. So long as you act in good faith, we will bear any arbitration filing, administrative, hearing and similar fees which you are required to pay to pursue a Claim (whether the fees are incurred in the initial arbitration proceeding or in an appeal to a panel of arbitrators), to the extent that you would not be required to bear such fees in an appropriate court of law. Subject to the last sentence of Section 2 hereof, each party must pay for its own attorneys, experts and witnesses, regardless of who wins the arbitration, except where applicable law and/or the Administrator's rules provide otherwise.

4. **GOVERNING LAW; OBTAINING INFORMATION (DISCOVERY).** This Provision involves interstate commerce and is governed by the Federal Arbitration Act, 9 U.S.C. Section 1 et seq. (the "FAA"), and not federal or state rules of civil procedure or evidence or any state laws that pertain specifically to arbitration. However, the laws of the state of "Governing Law" or similar terminology in your loan documents shall apply to the extent, and only to the extent, that state law is applicable under, and not preempted by, the FAA. The arbitrator shall be obligated to follow applicable substantive laws, statutes of limitation and privilege rules related to any Claim. The arbitrator shall award the remedies, if any, that would be available in an individual court proceeding if arbitration had not been elected. This includes, without limitation, compensatory, statutory and punitive damages (which shall be governed by the constitutional standards applicable in judicial proceedings); declaratory, injunctive and other equitable relief; and attorneys' fees and costs. Upon the timely request of either party, the arbitrator shall write a brief explanation of the grounds for his or her decision.

5. **NO CLASS ACTIONS, ETC.** Notwithstanding any other provision in this Provision to the contrary, if you or we elect to arbitrate a Claim, neither you nor we will have the right: (a) to participate in a class action in court or in arbitration, either as a class representative, class member or class opponent; or (b) to join or consolidate Claims with claims of any person other than you. No arbitrator shall have authority to conduct any arbitration in violation of this provision.

6. **EFFECT OF ARBITRATION AWARD.** Any court with jurisdiction may enter judgment upon the arbitrator's award. The arbitrator's award will be final and binding, except for: (1) any appeal right under the FAA; and (2) Claims involving more than $50,000, in which event any party may appeal the award (regardless of the amount) to a three-arbitrator panel appointed by the Administrator, which will reconsider de novo any aspect of the initial award that is appealed, and whose decision will be final and binding except for any appeal right under the FAA.

7. **CONTINUED EFFECT OF ARBITRATION PROVISION; SEVERABILITY; CONFLICTS.** This Provision shall survive (1) any modification, extension or forbearance of or under the Credit documents; (2) your full repayment of the Credit; (3) any sale or transfer of the Credit; (4) any foreclosure or other legal proceeding by us to collect a debt owed by you; (5) the transfer of any property securing the Credit; (6) any bankruptcy (except where prohibited by bankruptcy law); and (7) any rescission by you or attempt by you to rescind the Credit pursuant to any applicable law. If any portion of this Provision (other than Section 5(a)) cannot be enforced, the rest of this Provision will continue to apply. However, if Section 5(a) is held invalid in a proceeding in which you and we are involved, subject to the right to appeal such holding, the entire Provision (except this sentence) shall be null and void with respect to such proceeding.

**Governing Law.** This Agreement will be governed by federal law applicable to us and, to the extent not preempted by federal law, the laws of the State of Florida without regard to its conflicts of law provisions. This Agreement has been accepted by us in the State of Florida.

**Garnishment.** You consent to the issuance of a continuing writ of garnishment or attachment against your disposable earnings, in accordance with Section 222.11, Florida Statutes, in order to satisfy, in whole or in part, any money judgment entered in favor of us.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Interpretation.** You agree that this Agreement, together with the mortgage or deed of trust, is the best evidence of your agreements with us. If we go to court for any reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the mortgage or deed of trust or any other document to prove what you owe us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. You agree that, except to the extent you can show there is a billing error, your most current periodic statement is the best evidence of your obligation to pay.

**Severability.** If a court finds that any provision of this Agreement is not valid or should not be enforced, that fact by itself will not mean that the rest of this Agreement will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Agreement even if a provision of this Agreement may be found to be invalid or unenforceable.

**Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled "What you should know about Home Equity Lines of Credit," given with the application.

BORROWER:

X _____          X _____
ZAFER S. AYDINEL                             LINDA A. AYDINEL

---

Florida Documentary Stamp Tax

Florida documentary stamp tax in the amount required by law has been paid with respect to this Agreement on the Modification of Mortgage securing this Agreement.

## ACCESS 3 EQUITY LINE ACCOUNT AGREEMENT AND DISCLOSURE STATEMENT
(Continued)

Page 7

## BILLING ERROR RIGHTS

### YOUR BILLING RIGHTS

### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify us in case of errors or questions about your bill.**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at

    SunTrust Bank
    Credit Line
    P.O. Box 85160
    Richmond, VA 23285-5160

or at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

    Your name and account number.

    The dollar amount of the suspected error.

    Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your rights and our responsibilities after we receive your written notice.**

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

**Special Rules for Credit Card Purchases**

If you have a problem with the quality of property or services that you purchased with a credit card, and have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or service. There are two limitations on this right:

(a)    You must have made the purchase in your home state or, if not within your home state, within one hundred (100) miles of your current mailing address; and

(b)    The purchase price must have been more than $50.00.

The limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

LASER PRO Lending, Ver. 5.29.00.304 Copr. Harland Financial Solutions, Inc. 1997, 2005. All Rights Reserved. - FL I:\LPRO\CFI\LPL\D25.FC TR-678244 PR-ACCN